**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|   |   |   |
|---|---|---|
| | : | |
| **STEVE ANTHONY O.,** | : | |
| | : | **Civil Action No. 20-4169 (ES)** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | **OPINION** |
| | : | |
| **WILLIAM BARR,** _et al._, | : | |
| | : | |
| **Respondents.** | : | |
| | : | |

_____

**SALAS, DISTRICT JUDGE**

Before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 filed by petitioner Steve Anthony O. [1] ("Petitioner"). (D.E. No. 17 ("Petition" or "Pet.")). The Petition seeks immediate release from detention based on Petitioner's underlying medical issues and the threat of COVID-19. (_See generally id._). Also before the Court is Petitioner's motion for a temporary restraining order which similarly requests immediate release from immigration detention based on Petitioner's health and the COVID-19 pandemic. (D.E. No. 18 ("Motion" or "Mot."); D.E. No. 18-1 ("Petitioner Mov. Br.")). The Court has reviewed the parties' submissions and decides this matter without oral argument. _See_ Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For following reasons, the Court will deny the Petition and the Motion.

---

[1]    This Opinion identifies Petitioner by his first name and the first initial of his surname in light of certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with the Judicial Conference of the United States' Committee on Court Administration and Case Management's recommendations.

## I.    Background

### A.    Factual and Procedural Background

Petitioner is a citizen and national of Jamaica.   (Pet. ¶ 5; D.E. No. 25 ("Petitioner Decl.") ¶ 1).   Petitioner entered the United States on January 23, 2018, on a B-1 nonimmigrant temporary visa for business with authorization to remain in the United States for a temporary period not to exceed July 22, 2018.   (Petitioner Decl. ¶ 1; D.E. No. 20 ("Opp. Br.") at 7).[2]

On December 3, 2019, Petitioner was arrested in Bronx County, New York on charges of forcible touching in violation of New York Penal Law § 130.52(1) and sexual abuse in the third degree in violation of New York Penal Law § 130.55.   (Opp. Br. at 7; *see also* D.E. No. 20-7). Petitioner was released from criminal custody on his own recognizance.   (Petitioner Decl. ¶ 9). Petitioner claims that he is innocent of the crimes charged (*id.*), and Petitioner's immigration attorney states that the Assistant District Attorney prosecuting the criminal case made an offer to Petitioner to plead guilty to a disorderly conduct violation (D.E. No. 18-8 ("Rothman Decl.") ¶ 9; *see also* Petitioner Decl. ¶ 9).

Petitioner was taken into the custody of United States Immigration and Customs Enforcement ("ICE") on or about February 26, 2020, and since that time has been detained at Bergen County Jail ("BCJ").   (Pet. ¶ 12; Opp. Br. at 7–8).   Petitioner is being charged as removable for overstaying his B-1 visa.   (Rothman Decl. ¶ 4; Opp. Br. at 8).   ICE determined that Petitioner was subject to discretionary detention pursuant to the Immigration and Nationality Act § 236(a).   (Opp. Br. at 8; D.E. No. 20-6).   A bond hearing was originally scheduled for March

---

[2]     Respondents filed a brief in opposition to the Motion, which was docketed as an "Answer."   (D.E. No. 20). The Court interprets this filing as Respondents' answer to the petition and opposition to the Motion.

27, 2020, but was adjourned due to court staffing issues.   (Opp. Br. at 8).

On April 10, 2020, Petitioner filed a petition for writ of habeas corpus in the district court for the Southern District of New York.  (D.E. No. 1).  On April 14, 2020, the petition was transferred to this Court by consent of the parties after certain jurisdictional issues were raised. (D.E. No. 11).  On April 16, 2020, this Court ordered Petitioner to file an amended petition addressing Third Circuit legal authority and, to the extent necessary, against the appropriate respondent(s).  (D.E. No. 14).

On April 21, 2020, Petitioner filed the instant Petition and Motion.  In the Petition, Petitioner argues that, based on the COVID-19 pandemic and his age and his underlying medical conditions of major depressive disorder and hyperlipidemia, his detention at BCJ violates his substantive due process rights.  (*See generally* Pet.).  More specifically, Petitioner argues that in light of his age and medical conditions, Respondents' COVID-19 policies and practices (i) demonstrate objective deliberate indifference to his medical needs, and (ii) have rendered his detention punitive.  (Pet. ¶¶ 81–88).  In his accompanying Motion, Petitioner seeks immediate release and argues that: (i) he is likely to succeed on the merits of his due process claims (Petitioner Mov. Br. at 8–17); (ii) he will suffer irreparable harm in the form of severe illness or death should he remain in confinement (*id.* at 18–19); and (iii) the balance of the equities and the public interest favor release (*id.* at 19–20).  To justify the remedy of release, Petitioner relies on the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) and argues that "extraordinary circumstances" warrant release.   (*Id.* at 20–21).

Upon receiving the Petition and Motion, the Court set a briefing schedule, and on April 24, 2020, the Respondents filed an answer to the Petition which contains its opposition to the Motion.

(D.E. No. 20).   On April 27, 2020, Petitioner filed its reply.   (D.E. No. 22 ("Petitioner Reply Br.")).   On April 29, 2020, the Court issued an Order indicating that it would delay rendering a decision on the Motion until (i) Petitioner cured a procedural deficiency with the Motion and (ii) after the Petitioner's upcoming bond hearing, which was rescheduled for May 4, 2020.   (D.E. No. 24).   On Monday May 4, 2020, counsel for Petitioner informed the Court that Petitioner was denied bond and submitted an additional declaration to cure the procedural deficiency highlighted by the Court.   (D.E. Nos. 25 & 26).   On May 5, 2020, Respondents submitted an additional exhibit, containing the Petitioner's updated medical records.   (D.E. No. 29 ("Medical Records")). This Opinion follows.

### B.    COVID-19

As a preliminary matter, it is difficult to overstate the severity of the COVID-19 outbreak and the global crisis that society is facing in light of this unprecedented public health crisis.   The seriousness of the outbreak is extensively detailed in the parties' submissions and is undisputed by the Respondents.   (Opp. Br. at 1).   COVID-19, or the novel coronavirus disease 2019, "is an infectious disease caused by a newly discovered coronavirus."[3] *Coronavirus Overview*, WORLD HEALTH ORGANIZATION,  https://www.who.int/health-topics/coronavirus#tab=tab_1 (last visited May 12, 2020) (hereinafter "*Coronavirus Overview*").   The World Health Organization reports that COVID-19 "is spreading very easily and sustainably between people."   *How COVID-19 Spreads*,    CENTERS    FOR    DISEASE    CONTROL    AND    PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html    (last

---

[3]        On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post (Mar. 11, 2020, 3:45 PM), https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/.

visited May 12, 2020).    The person-to-person spread of COVID-19 can occur (i) between individuals who are in close contact, meaning within about six feet, and (ii) by an infected individual's respiratory droplets produced from sneezing, coughing, or talking.    *Id.*    The virus can also be spread by infected, but asymptomatic, individuals.    *Id.*    However, "[m]ost people infected with COVID-19 will experience mild to moderate respiratory illness and recover without requiring special treatment."    *Coronavirus Overview*.

Although COVID-19 symptoms can be mild, the Centers for Disease Control and Prevention ("CDC") identified certain groups of individuals who might have a higher risk for developing severe illness from COVID-19, including:   (i) individuals 65 years and older as well as nursing home/long-term care facility populations; (ii) individuals with underlying medical conditions such as "chronic lung disease or moderate to severe asthma," "serious heart conditions," severe obesity, diabetes, "chronic kidney disease undergoing dialysis," and liver disease; and (iii) individuals who are immunocompromised from "cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."    *See People Who Are at Higher Risk for Severe Illness*,    CDC,    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 12, 2020) (hereinafter "*People Who Are at Higher Risk for Severe Illness*").

As of May 12, 2020, in New Jersey alone, there have been 139,945 lab-confirmed COVID-19 cases and 9,310 lab-confirmed COVID-19 related deaths.    *COVID-19 Information Hub*, State of New Jersey, https://covid19.nj.gov/ (last visited May 12, 2020).    Bergen County, the locality of BCJ, has 17,028 cases and 1358 deaths.    *Id.*    Certainly, it is well documented and undisputed

that COVID-19 has taken the lives of many and presents an enormous risk to us all, including those in jails and detention centers. *See Thakker v. Doll*, No. 20-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020). In the wake of COVID-19, the Court considers the Petition and Motion with the utmost gravity.

## II.    Legal Standards

### A.    Jurisdiction

Habeas relief may be extended to a prisoner pursuant to 28 U.S.C. § 2241(c) only when he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal court has jurisdiction over such a petitioner if he is "in custody" and the custody is allegedly "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Here, Petitioner is currently detained in a locality within this Court's jurisdiction and by a custodian located within the Court's jurisdiction. The Petition and Motion assert that Petitioner's continued detention violates his due process protected under the Constitution. Accordingly, this Court has jurisdiction over his claims. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494–95, 500 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

Moreover, it is true that, traditionally, 42 U.S.C. § 1983 is the proper statute under which prisoners have asserted conditions of confinement claims. *See e.g.*, *Camacho Lopez v. Lowe*, No. 20-563, 2020 WL 1689874, at *4–6 (M.D. Pa. Apr. 7, 2020). Conversely, challenges to "the fact or length of confinement" are properly brought in a habeas corpus petition. *See Tedford v. Hepting*, 990 F.2d 745, 748 (3d Cir. 1993) (quoting *Preiser v. Rodriguez*, 411 U.S 475, 494 (1973)). Here, Petitioner seeks immediate release, which is a remedy available through a habeas

6

petition, not in a civil rights action.  *See, e.g.*, *Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002).  There is currently no Third Circuit or Supreme Court decision that directly addresses whether a conditions of confinement claim may be raised in a habeas corpus petition.  *Camacho*, 2020 WL 1689874, at *5; *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–42 (3d Cir. 2005).  However, the Supreme Court has stated that "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."  *Preiser*, 411 U.S. at 494; *see also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862–63 (2017).  Similarly, the Third Circuit has alluded to the possibility of a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action *only in extreme cases*."  *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978) (emphasis added).

Recently, many other courts in the Third Circuit have permitted petitioners to raise conditions of confinement challenges through habeas petitions.  *See e.g.*, *Jorge V.S. v. Green*, No. 20-3675, 2020 WL 1921936, at *2 (D.N.J. Apr. 21, 2020); *accord Camacho*, 2020 WL 1689874, at *4–6; *Umarbaev v. Lowe*, No. 20-0413, 2020 WL 1814157, at *5 (M.D. Pa. Apr. 9, 2020).  After reviewing these cases and the applicable Supreme Court and Third Circuit precedent, the Court agrees with the line of cases that have allowed conditions of confinements claims to proceed in habeas corpus petitions and will allow the Petitioner to pursue a claim challenging his conditions of confinement in the present habeas corpus Petition.

### B.    Release as a Remedy

Although Respondents do not directly challenge the Court's jurisdiction, Respondents argue that the Court cannot hear Petitioner's claims because it has no jurisdiction to review the

decision of an immigration judge denying bond.    Respondents point out that the only relief Petitioner seeks is release and argue that "the procedures available to Petitioner in immigration court satisfy constitutional requirements."    (Opp. Br. at 12–13 & 15).    Respondents further argue that because the benefit sought here—release from custody—is discretionary, there can be no due process claim to it.    (*Id.* at 15–16).

However, as the Court interprets the Petition and Motion, Petitioner does not seek a review of the bond hearing, and the Court does not engage in such a review.    Nor does Petitioner argue that he has a due process claim to *release*.    Instead, Petitioner argues that his current conditions of confinement violate his due process rights, and that extraordinary circumstances warrant release as a remedy pursuant to the Third Circuit's decision in *Lucas*, 790 F.2d at 367.[4]    (*See generally* Pet.).    With this framework in mind, the Court turns to the merits of the Petition.

## III.    Discussion

Traditionally, conditions of confinement claims by sentenced prisoners arise under the Eighth Amendment.    *Helling v. McKinney*, 509 U.S. 25, 27–28 (1993).    As part of its prohibition of "cruel and unusual punishment," the Eighth Amendment, for example, prohibits prison officials from using excessive physical force against prisoner and imposes duties on these officials to provide humane conditions of confinement.    *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).    In

---

[4]    The Third Circuit's decision in *Lucas* established that "extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."    790 F.2d at 367.    In *Lucas*, the Third Circuit noted that extraordinary circumstances may be established where the district judge ordered the release of a state inmate to a hospital because the inmate was extremely ill.    *Id.* at 366–67 (citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955)).    The panel, however, did not expressly limit the finding of extraordinary circumstances to situations involving a petitioner's poor health.    *Id.* at 367.    Recent decisions have applied this standard to determine whether extraordinary circumstances exist, in the context of the COVID-19 pandemic, to grant release to immigration habeas petitioners.    *See, e.g.*, *Ousman D. v. Decker*, No. 20-2292, 2020 WL 1847704, at *8–10 (D.N.J. Apr. 13, 2020); *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *8 (S.D.N.Y. Mar. 27, 2020) (applying an analogous Second Circuit standard set forth in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)).    Here, Petitioner does not raise a substantive claim pursuant to *Lucas* but uses it to justify release as a remedy.    (Pet. ¶¶ 77–80).

particular, prison officials must not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."  *Helling*, 509 U.S. at 33–34 (noting that the Eighth Amendment requires a remedy when "inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease") (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

However, conditions of confinement claims brought by an immigration detainee are grounded in due process under the Fifth Amendment, not the Eighth Amendment.  *See E.D. v. Sharkey*, 928 F.3d 299, 306–7 (3d Cir. 2019) ("[W]hen pretrial detainees challenge their conditions of confinement, we must consider whether there has been a violation of the Due Process Clause . . . ."); *see also Zadvydas*, 533 U.S. at 690, 693.  Under the Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt."  *Sharkey*, 928 F.3d at 307 (quoting *Bell v. Wolfish*, 441 U.S. 520 (1979)).  To determine whether challenged conditions amount to punishment, courts must determine "whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees."  *Id.* (internal quotation marks and citation omitted).

Although *Helling* involved a conditions of confinement claim by a sentenced prisoner, and therefore arose under the Eighth Amendment, its application of the deliberate indifference standard and reasoning are nonetheless relevant in the context of a conditions of confinement claim brought by an immigration detainee.  *See, e.g., United States v. Laury*, No. 17-313, 2020 WL 2036718, at *6 n.1 (M.D. Pa. Apr. 28, 2020).  This is because "the Due Process rights of a pretrial detainee

are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987) (internal quotation mark omitted).

Because the Third Circuit and Supreme Court have yet to provide judicial guidance on how to navigate these claims in light of the unprecedented pandemic, the Court notes that there have been varying opinions among federal district courts throughout the country.[5]  While the Court is guided by the discussions in these prior cases, "habeas review is entirely individual," *Umarbaev*, 2020 WL 1814157, at *7.  Based on a highly individualized analysis for this Petitioner, the Court finds that Petitioner fails to establish a deliberate indifference claim or a punitive conditions claim, and thus is not entitled to relief for his petition.

### A.    Deliberate Indifference

To establish a claim for deliberate indifference to medical needs under the Due Process Clause, the Petitioner must show that (i) he has a serious medical need; and (ii) that Respondents' acts or omissions were deliberately indifferent to Petitioner's medical needs.  *See, e.g.*, *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159–60 (3d Cir. 2017).  The Supreme Court has stated that deliberate indifference to a prisoner's medical needs exists only if "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  This standard requires that the officials are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that they draw such an inference. *Natale*, 318 F.3d at 582.

---

[5]        *Compare Cristian A.R. v. Decker*, No. 20-3600, 2020 WL 2092616 (D.N.J. Apr. 12, 2020); *Rafael L.O. v. Decker*, No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Thakker*, 2020 WL 1671563; *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020), *with Graham v. Decker*, No. 20-2423, 2020 WL 1847568, at *4 (S.D.N.Y. Apr. 13, 2020); *Umarbaev*, 2020 WL 1814157; *Lopez v. Lowe*, No. 20-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020); *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020); *Dawson v. Asher*, No. 20-409, 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020).

As a preliminary matter, the Petition and Motion appear to base the deliberate indifference claim on the Respondents' deliberate indifference to the risk that COVID-19 poses to the Petitioner in light of his underlying medical conditions.  In other words, it does not appear that Petitioner argues that Respondents are deliberately indifferent to his medical needs in general, but more specifically in the wake of COVID-19.  Nevertheless, out of an abundance of caution, the Court will first consider whether Respondents are deliberately indifferent to Petitioner's medical needs generally, and then more specifically in the context of COVID-19.

Petitioner cites to his age (45), major depressive disorder, and hyperlipidemia as underlying conditions that place him at high risk for severe infection if he were to contract COVID-19 and that justify his release.  (Pet. ¶ 59).[6]  Respondents do not dispute that Petitioner has these conditions, and the medical records appear to substantiate each condition to varying degrees.  (*See generally* Medical Records).  Nor do Respondents necessarily dispute that these conditions are "serious."  (Opp. at 3).  However, they do dispute whether the stated conditions "carry an increased risk of more severe illness from COVID-19."  (*Id.*).  As Respondents point out, Petitioner's stated conditions do not appear on the CDC's list of conditions that put people at a higher risk of severe illness from COVID-19.  (*Id.* at 8–9).[7]  But Petitioner compiles and cites to

---

[6]    In his reply brief, Petitioner adds an argument that he has blood pressure levels that are within the range of hypertension (systolic blood pressure at or above 130 mm Hg and diastolic blood pressure at or above 80 mm Hg). (Petitioner Reply Br. ¶¶ 3, 5 & 6).  Although Petitioner acknowledges that individuals with hypertension "do[] not fall under the CDC's limited list of people who are at higher risk for severe illness," he nevertheless argues that the CDC's "own data shows that those with hypertension make up almost half of the hospitalized subjects in their own study."  (*Id.* ¶ 6).  Even so, there is no diagnosis of hypertension in the medical records.  (*See generally* Medical Records).  Moreover, Petitioner's reliance on two isolated blood pressure readings is unpersuasive in light of the numerous other readings in the medical records that show blood pressure levels below the range of hypertension. (*Compare* Medical Records at 90 & 105 (showing high blood pressure levels on February 27, 2020, and on March 10, 2020) *with* Medical Records at 10, 16, 19, 28 & 47 (showing blood pressure readings below the level of hypertension on April 15, 2020, April 25, 2020, and April 27, 2020).  Accordingly, Petitioner has not shown that he suffers from hypertension.

[7]    In line with Respondents' position, the Court notes that some courts have found the CDC's list to be determinative on the issue of whether a given individual should be released based on an increased risk of serious

other evidence that suggests that these conditions do place him at a heightened risk.   (Pet. ¶ 59;
Petitioner Reply. Br. ¶¶ 4–6).   The Court need not resolve this dispute because, in any event, the
medical conditions alone do not compel release under the deliberate indifference standard.
Rather, Petitioner must demonstrate that Respondents knew of a substantial risk to the Petitioner
based on his medical needs, and that Respondents failed to take adequate preventative measures
to combat the spread of COVID-19 in light of those needs.   *See Farmer*, 511 U.S. at 837.   Based
on the facts before the Court, Petitioner has failed to meet this burden, and the Court concludes
that Respondents have not been deliberately indifferent to each of Petitioner's stated medical needs
either before or during the COVID-19 pandemic.

### i.    *Major Depressive Disorder*

Petitioner's theory with respect to his major depressive disorder is a bit nuanced.
Petitioner does not appear to argue that his major depressive disorder puts him at a higher risk for
complications if he were to contract COVID-19.   Instead, Petitioner argues that the policies and
practices put into effect at BCJ as a result of COVID-19 have exacerbated Petitioner's depression,
causing him to contemplate suicide.   (Petitioner Mov. Br. ¶¶ 43 & 49).   In his declaration,
Petitioner states that he "was diagnosed with [m]ajor [d]epressive [d]isorder," and that his
"depression has become much worse, and [he] think[s] suicidal thoughts."   (Petitioner Decl. ¶ 6).

While Petitioner's medical records do substantiate Petitioner's major depressive disorder,
they also demonstrate two key points: (i) that Petitioner's depression has vastly improved over the
past few weeks; and (ii) that Respondents have been responsive to any medical needs Petitioner

---

illness from COVID-19.   *See Barbecho v. Decker*, No. 20-2821, 2020 WL 1876328, at *5 (S.D.N.Y. Apr. 15, 2020)
(collecting cases for the proposition that "the Government does not act with deliberate indifference to the needs of
ICE detainees who do not meet the CDC's criteria for groups at higher risk of severe illness from COVID-19.").

has with respect to this condition.   To start, the Medical Records show that Petitioner denied any present psychiatric issues at his initial mental health screening on February 28, 2020, and prior to April 24, 2020, Petitioner denied having any suicidal ideations.   (Medical Records at 100–03 & 105–08).[8]   The Medical Records do show that, in late April 2020, Petitioner informed his attorney that he was suicidal, resulting in medical attention at BCJ.   (*Id.* at 4).   On April 24, 2020, Petitioner was assessed via telehealth video and indicated that when he wakes up in the morning, he has suicidal thoughts.   (*Id.* at 36).   The notes from that assessment indicate that Petitioner was depressed, sad, anxious, irritable, agitated, and angry.   (*Id.*).   A new medical problem of "major depression" was added to Petitioner's chart, and Petitioner was directed to stay on the medical unit, and certain medication was initiated.   (*Id.* at 37).   Respondents continued to monitor Petitioner's condition and, after that one incident, Petitioner continually denied having any suicidal ideations, and his mood showed overall improvement.   (*See* Medical Records at 4–6, 12–14 & 28–31).   The Medical Records reflect that on May 5, 2020, Petitioner presented with a "bright affect and cooperative mood" and denied feeling suicidal.   (*Id.* at 6).   Petitioner cited to his medication and his new roommate as reasons for his improvement.   (*Id.*).

In light of the record before the Court, the Court cannot conclude that Petitioner's major depressive disorder is a "serious medical need" that causes "excessive risk to [Petitioner's] health or safety" such that the assessment and treatment Respondents provided amount to deliberate indifference.   *See Natale*, 318 F.3d at 581–82; *Farmer*, 511 U.S. at 837.   Given the immediate treatment Petitioner received for his major depressive disorder, and Petitioner's demonstrable

---

[8]    Petitioner submitted a psychological evaluation dated October 7, 2019, which includes a diagnosis of major depressive disorder, single episode, severe, with anxious distress.   (D.E. No. 17-5).   Thus, it does appear Petitioner suffered from major depressive disorder prior to this date.   (*Id.*).   The Medical Records confirm that Petitioner acknowledged past psychiatric treatment during his initial mental health screening.   (Medical Records at 100).

improvement as a result of that treatment, Petitioner has not met his burden of a showing of a "reckless[] disregard [of] a substantial risk of serious harm." *Giles v. Kerney*, 571 F.3d 318, 330 (3d Cir. 2009); *Pearson v. Prison Health Service*, 850 F.3d 526, 536 (3d Cir. 2017) ("when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care."); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) (explaining that deliberate indifference requires something "more than negligence").

### ii.    *Hyperlipidemia*[9]

The Medical Records show that Respondents have been similarly attentive to Petitioner's hyperlipidemia. Petitioner reported his hyperlipidemia to medical personnel upon intake but denied taking any medication for that condition. (Medical Records at 108). On March 10, 2020, Petitioner again acknowledged his hyperlipidemia, and stated that he had taken medication in the past, but he could not remember the name of the medication. (*Id.* at 88). The chronic care assessment and plan notes for that date include Petitioner's dyslipidemia and indicate that Petitioner was started on a medication called Lipitor. (*Id.*). The notes also indicate that Petitioner was to obtain a "chem panel" and a "lipid profile." (*Id.*). It appears that Petitioner continues to take Lipitor to manage his dyslipidemia. (*Id.* at 3). Indeed, Petitioner does not allege that he has stopped receiving this medication. Instead, Petitioner argues that, due to COVID-19, he is not receiving the special meals for his cholesterol levels that he typically

---

[9]    The medical records describe Petitioner as having "hyperlipidemia," "hypercholesterolemia," and "dyslipidemia." (*See e.g.*, Medical Records at 1, 14, 88 & 108). Although not clearly defined by the parties, it appears that hypercholesterolemia is a form of hyperlipidemia. *Medical Definition of Hypercholesterolemia*, MEDICINENET, https://www.medicinenet.com/script/main/art.asp?articlekey=3835 (last visited on May 12, 2020). Dyslipidemia is a broader term used to describe abnormal cholesterol levels. *Medical Definition of Dyslipidemia*, MEDICINENET, https://www.medicinenet.com/script/main/art.asp?articlekey=33979 (last visited on May 12, 2020). For this Petitioner, it appears that, regardless of the term used, the medical condition at issue is high cholesterol levels.

receives.   (Petitioner Decl. ¶ 6).   But this vague assertion, without any particularized assertion that Petitioner's health is at risk without such meals, is not enough to show a deliberate indifference to a serious risk of harm.   *See Alpheaus v. Camden Cty. Corr. Facility*, No. 17-0180, 2017 WL 2363001, at *10 (D.N.J. May 31, 2017) (explaining that "inmates must be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger' to their health and well-being") (quoting *Duran v. Merline*, 923 F. Supp. 2d 702, 720 (D.N.J. 2013)).

Accordingly, in their totality, the allegations with respect to Petitioner's hyperlipidemia are simply not enough to show a reckless disregard of a substantial risk of serious harm.   *Giles*, 571 F.3d at 330.

### iii.    COVID-19 Precautions

Having found that Respondents are not indifferent to Petitioner's underlying medical needs in general, the Court now turns to the more specific question of whether Respondents are deliberately indifferent to the risk that COVID-19 poses to the Petitioner in light of his underlying medical conditions and his age.[10]   Given the various measures implemented at BCJ to combat the spread of COVID-19, and the fact that Petitioner continues to receive reasonable treatment for his underlying conditions, the Court does not find that Respondents are deliberately indifferent to Petitioner's medical needs in light of the COVID-19 pandemic.

To start, the Court acknowledges BCJ's efforts to detect and isolate potential or confirmed

---

[10]    With respect to Petitioner's age, the Court notes that the CDC only lists those individuals 65 years or older in the higher risk category of severe illness.   *See People Who Are at Higher Risk for Severe Illness*.   Nevertheless, Petitioner cites to language which "***suggests***" that individuals over 45 years old "***could be***" considered high risk for severe disease.   (Petitioner Reply Br. ¶ 4) (emphases added).   Even if the Court assumes that Petitioner's age puts him at a high risk for severe disease, the Court's conclusion would not change.

cases of COVID-19.  BCJ keeps individuals who are confirmed positive for COVID-19 in isolation and does not house them with symptomatic but unconfirmed individuals.  (*See* D.E. No. 20-5 ("Ahrendt Decl.") ¶¶ 9(b) & (i)).[11]  While confirmed and unconfirmed individuals are housed in the same housing unit and away from the general population, each individual is isolated in a cell.  (*Id.* ¶ 9(i)).  The confirmed positives are housed on one side of the housing unit, and the suspected positives are housed on the other end of the housing unit, and the two groups are separated by approximately 30 to 40 feet in distance.  (*Id.*).  Moreover, in compliance with CDC guidelines for correctional facilities, detainees or inmates who exhibit symptoms of COVID-19 may make daily sick calls,[12] and BCJ may transport them to local hospitals for medical evaluation. (*Id.* ¶ 9(h)).  In addition, individuals who have had a known exposure to a confirmed case of COVID-19 but are asymptomatic are cohorted with other asymptomatic and unconfirmed individuals for 14 days.  (*Id.* ¶ 9(j)).

Petitioner does not dispute these facts but argues that the recommended social distancing practices cannot be adhered to at BCJ.  (Pet. ¶¶ 34 & 41–43).  However, Petitioner's arguments about social distancing are based on generalized facts and data about how social distancing generally cannot be maintained at correctional facilities, and do not consider the specific conditions at BCJ.  (*See e.g.*, *id.* ¶¶ 41–46).  On the other hand, Respondents provide detailed information about the specific measures taken at BCJ through the Ahrendt declaration.  (*See generally* Ahrendt Decl.).  As set forth in the declaration, although BCJ has a maximum capacity

---

[11]    Steven Ahrendt is Warden with the Bergen County Sheriff's Office currently assigned at BCJ.  (Ahrendt Decl. ¶ 1).

[12]    The Medical Records show that Respondents have been responsive to Petitioner's sick calls to date, even for non-COVID related symptoms.  (*Compare e.g.*, Medical Records at 112–115, 118, 120, 125 & 130 (Petitioner's sick slips) *with* Medical Records at 47, 51, 62–63, 65–66 & 81–83 (reflecting medical visits in response to the sick slips)).

to house 1200 inmates and detainees, as of April 21, 2020, the facility housed a total of 389 inmates and detainees, of whom 160 are ICE detainees and 229 are county inmates.  (*Id.* ¶ 4).  ICE detainees and county inmates are housed separately, with ICE detainees being housed in five housing units.  (*Id.* ¶ 5).  Each cell measures 10' x 7' and contains two beds in a bunk-bed style.  (*Id.* ¶ 6).  All detainees remain in their cells for 23 hours each day.  (*Id.* ¶ 9(f)).  During the one hour each day when inmates are permitted to exit the cell area, only six detainees are permitted to leave at any given time, and those six detainees share 2643 square feet of space that includes showering facilities.  (*Id.* ¶¶ 9(f) & (l)).  Thus, it appears that these policies allow Petitioner to remain at a social distance from everyone at BCJ, with the exception of a single cell mate.  Notably, neither the Petition nor the Motion clarifies whether Petitioner currently has a cell mate.  The Court's own review of the Medical Records reveals that Petitioner was without a cell mate as of April 25, 2020 (Medical Records at 6), but by May 5, 2020, Petitioner was sharing a cell (*id.*).  However, because Petitioner makes no argument about having to share a cell with one other individual, and, in fact, sharing a cell appears to have *helped* with Petitioner's major depressive disorder  (*id.*), this Court cannot conclude that Petitioner's current housing arrangement places him at any greater risk.  Accordingly, the Court concludes that the social distancing measures taken at BCJ weigh against a finding of deliberate indifference.

Next, Petitioner alleges various perceived inadequacies with respect to BCJ's cleaning and sanitization protocols.  (Petitioner Decl. ¶ 7).  However, even considering these perceived inadequacies, Petitioner does not dispute many of the efforts BCJ has undertaken to prevent the spread of COVID-19.  Specifically, Petitioner alleges that he has only received one mask and has not received gloves or hand sanitizer; the communal areas such as phones and showers are not

cleaned after every use; and that he only has a single bar of soap for hand washing and other cleaning in his cell. (*Id.*). But Petitioner does not dispute that (i) all housing units are sanitized no less than four times per day; (ii) during the hour Petitioner can be outside of his cell, he has access to disinfectant spray and soap which can be used to clean his hands and his cell; (iii) while in his cell, Petitioner has access to soap for hand washing as needed; and (iv) Petitioner has been provided with a mask for his usage. (Ahrendt Decl. ¶ 9(l)). While BCJ's sanitation practices may not be perfect, perfection is not required under the Constitution, and the perceived inadequacies here are not enough to show deliberate indifference sufficient to warrant release. *See, e.g.*, *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL 2092791, at *9 (D.N.J. May 1, 2020) (finding that petitioner failed to show a likelihood of success on a deliberate indifference claim where the facility had increased general cleaning and instituted social distancing and other COVID-19 protocols); *Juan E.M. v. Decker*, No. 20-4594, 2020 WL 2214586, at *9-10 (D.N.J. May 7, 2020) (finding no deliberate indifference where "the evidence demonstrate[d] that Respondents ha[d] enacted numerous preventative measures to combat the spread of COVID-19," including increased cleaning, education, and social distancing).

Finally, while the Court is alarmed by the fact that twenty-four corrections police officers and four nurses who work at BCJ have tested positive for COVID-19, the Court notes that among the detainee population, to which Petitioner belongs, as of April 21, 2020, only two ICE detainees had tested positive. (*Id.* ¶ 9(o)). Thus, based on the precautionary measures BCJ has taken, and, as discussed above, the medical assessment and treatment BCJ provides to Petitioner for his hyperlipidemia and major depressive disorder, the Court finds that Petitioner fails to establish that Respondents have been deliberately indifferent to Petitioner's needs in light of the pandemic. *See*

*Saquib K. v. Tsoukaris*, No. 20-3849, 2020 WL 2111028, at *3 (D.N.J. May 4, 2020) (denying a detainee's deliberate indifference claim because he failed to show that the facility had been deliberately indifferent to Petitioner's medical needs, even in light of COVID-19).

**B.    Conditions of Confinement**

The Supreme Court has stated that "[i]n evaluating whether a pretrial detainee's conditions of confinement violate his substantive due process rights, 'the proper inquiry is whether those conditions amount to punishment of the detainee.'" *Umarbaev*, 2020 WL 1814157, at *6 (quoting *Bell*, 441 U.S. at 535); *see also Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2007).   Under *Bell*, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68).   The Court's "inquiry into whether given conditions constitute 'punishment' must therefore consider the totality of circumstances within an institution." *Hubbard v. Taylor*, 399 F.3d 150, 160 (3d Cir. 2005).

Here, Petitioner does not appear to argue that Respondents have an express intent to punish. (Pet. ¶¶ 70–72).   Nor does Petitioner dispute the government's stated legitimate interest in ensuring Petitioner does not flee or endanger the community.   (Petitioner Mov. Br. ¶ 46).   Thus, the sole issue before the Court is, given Petitioner's medical conditions and the ongoing COVID-19 pandemic, whether Petitioner's conditions of confinement are excessive in relation to the government's legitimate interest.

The Court concludes that Petitioner's conditions of confinement do not rise to the level of

19

undue punishment.   In making this decision, the Court does not take lightly the seriousness of the ongoing pandemic or the fact that certain individuals are more susceptible to severe illness from COVID-19.   However, as discussed at length above, it is undeniable that BCJ has taken various preventative measures to combat the spread of COVID-19.   Because of these efforts, BCJ had, as of April 21, 2020, three confirmed positive cases and five suspected cases, among about 389 inmates and detainees.   (Ahrendt Decl. ¶ 9(o)).   To meet their constitutional obligations, Respondents' preventative measures need not guarantee the status quo of Petitioner's health or that he will never contract the virus.  *See Jorge V.S.*, 2020 WL 1921936, at *3 (citing *Sacal-Micha*, 2020 WL 1518861, at *6).   All that is needed is that Petitioner's current conditions of confinement, in light of the pandemic and his underlying medical conditions, are "rationally related to a legitimate non-punitive government purpose."   *Bistrian*, 696 F.3d at 373.   Given BCJ's current measures to combat the spread of COVID-19 and the medical treatment it continues to provide to Petitioner, and in light of the legitimate government interest to enforce the immigration laws and ensure that Petitioner does not flee or pose a danger to the community, the Court concludes that Petitioner is not subject to punitive conditions of confinement.[13]

## C.    Temporary Restraining Order

As noted above, Petitioner also filed a motion for a temporary restraining order which seeks

---

[13]        The Court notes that Petitioner relies primarily on *Thakker*, 2020 WL 1671563, *Cristian A.R.*, 2020 WL 2092616, and *Rafael L.O.*, 2020 WL 1808843 as support for the Petition and Motion.   All three of these cases were decided over one month ago, and as acknowledged by various courts, ICE has undertaken changes since then to address identified deficiencies.   *See Daniel R.-S. v. Anderson*, No. 20-3175, 2020 WL 2301445, at *6 (D.N.J. May 8, 2020) (collecting cases).   Even at BCJ itself, which was one of the facilities at issue in *Cristian A.R.*, several changes have been made including (i) reduction of the detainee population from 245 to 160; (ii) all staff members have been issued and are wearing masks while inside the facility; and (iii) detainees have been issued surgical masks and wear their issued masks any time that they are out of their cells.   (*Compare* Ahrendt Decl. ¶¶ 4, 9(e) & 9(n) *with Cristian A.R.*, Civil Action No. 20-3600, D.E. No. 20-4 (April 8, 2020 Declaration of Steven Ahrendt) ¶¶ 4 & 9(g)).   Moreover, in *Cristian A.R.*, petitioners made allegations regarding the availability of cleaning supplies, soap and medical treatment which are not made here.   *Cristian A.R.*, 2020 WL 2092616, at *5–6.

relief similar to that in his Petition, namely, his release from immigration detention.    (*See generally* Mot.).    Requests for preliminary injunctions and temporary restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.    To obtain a temporary restraining order, the moving party must show: "(l) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."    *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).    The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.    *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).    If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief.    *Id.* at 176 & 179.

Petitioner is not entitled to a temporary restraining order in this case as he has failed to show a likelihood of success on the merits.    Indeed, as described above, this Court is denying his Petition.    Accordingly, Petitioner's Motion will also be denied.    *See Senad M. v. Ahrendt*, No. 19-17536, 2020 WL 1969894, at *3-4 (D.N.J. Apr. 24, 2020) (denying a preliminary injunction motion when petition is denied on merits).

## IV.    Conclusion

For the reasons discussed above, Petitioner's habeas corpus Petition and Motion for a temporary restraining order are DENIED.    An appropriate order follows.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**

21